JAS. A. KING, Minister of the Interior of the Republic of Hawaii, on behalf of the Republic of Hawaii *v.* OAHU RAILWAY & LAND COMPANY, a domestic corporation.

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

SUBMITTED JANUARY 9, 10, AND 11, 1899.    DECIDED MARCH 23, 1899.

JUDD, C.J., WHITING, J., AND CIRCUIT JUDGE PERRY, IN PLACE OF FREAR, J., DISQUALIFIED.

A certificate of approval by the Cabinet, in accordance with the statutes, of the location of the Oahu Railway & Land Company does not carry with it the right to condemn land under navigable waters of the harbor of Honolulu and a right of way over the harbor, where the contemporaneous correspondence between the parties and a contemporaneous lease between them plainly indicate that the government had a contrary intention, even though the location approved covers land under navigable waters.

The State has the possession and control of the navigable waters of the said harbor and is a trustee thereof for the public and cannot absolutely alienate such interest.

OPINION OF THE COURT BY JUDD, C.J.

This is a bill in equity for an injunction, as follows:

To the Honorable A. Perry, First Judge of the Circuit Court aforesaid:

The undersigned, James A. King, Minister of the Interior of the Republic of Hawaii, acting in his official capacity for and on behalf of the Government of the Republic of Hawaii, plain-

tiff herein, complaining of the Oahu Railway & Land Company, Limited, a corporation created under and existing by virtue of the laws of the Republic of Hawaii and doing business on the Island of Oahu, defendant herein, says:

I.

That the Republic of Hawaii is seized in fee simple of all those premises situate in and adjacent to Honolulu harbor, Island of Oahu, and bounded and described as follows (the metes and bounds are identical with those given in the lease hereinafter set out).

II.

That on the 15th day of March, A. D. 1890, Lorrin A. Thurston, Minister of the Interior of the then Hawaiian Kingdom, acting for and on behalf of the Hawaiian Government, leased to the defendant herein the above described premises together with adjacent premises more particularly described in said lease, a copy of which is attached hereto and made a part hereof and marked "Exhibit A."

That under said lease the Government has the right to take possession of the land demised, or any part thereof, together with the improvements on the same or on any portion, which may be so taken, at any time after giving ninety days' notice so to do and the payment or tender to the company of the value of such improvements.

That the Government of the Republic of Hawaii desire to and are about to take over the property demised as aforesaid for the purpose of establishing Government wharves, and in furtherance of such desire and intention, on the 27th day of September, A. D. 1897, it, by James A. King, Minister of the Interior, notified the defendant of its intention to take possession at the end of ninety days from that date of the premises demised as aforesaid, together with all the improvements on the same, not, however, including the coal hoisting plant, and estimating the value of such improvements at $16,560.00, and further notified the defendant that at the end of said ninety days it would tender and pay said sum, or in lieu thereof such sum as should be agreed upon, or in default of agreement such sum as shall be named by a board of arbitrators according to the provisions of the said lease.

III.

That the premises described by metes and bounds as aforesaid are below low water mark and that the tide ebbs and flows over the same.

IV.

That the land and waters of the harbor of Honolulu and rights appurtenant thereto are the property of the Republic of Hawaii.

V.

That the wharfage and dock facilities of the harbor of Honolulu are inadequate to meet the requirements of shipping, commerce and trade.

VI.

That the Hawaiian Government is proceeding with extensive wharf improvements in the harbor of Honolulu and is taking under the powers vested in it by law, all property facing on said harbor suitable for wharf purposes for the purpose of erecting and maintaining public wharves, and that the property above described is necessary for such purposes.

VII.

That the defendant herein has served notice upon the plaintiff of its intention to take and appropriate the property hereinabove particularly described, together with the perpetual right for it, its successors and assigns, to make, and if necessary to maintain and use the right of way by water for vessels and all other water craft of any draught, whatsoever, over and upon all land and water (the same being owned by the Republic of Hawaii) between the land above described and deep water in Honolulu harbor and every part thereof, and the right for it, its successors and assigns, to sail, haul and otherwise transport vessels and all other water crafts of whatsoever draught across and over the said right of way and every portion thereof, a copy of which notice is hereto attached and made a part hereof and marked "Exhibit B."

That said land and right of way proposed to be appropriated by the defendant are being used for public purposes, to wit: for the sailing, navigation and anchorage of vessels.

That the use to which said property is being put at the present time and the use which the same is about to be put to is a more necessary public use than that for which it is sought to be appropriated by the defendant.

That the Government of the Republic of Hawaii is authorized

and empowered by law not only to take all real estate belonging to any person or persons or corporations, together with all structures and improvements thereon, franchises or appurtenances thereunto belonging and all property appropriated to some public use where it appears that the use to which said property is sought to be put is a more necessary public use than that to which it has already been appropriated, but to retain all property vested in it which is being used for public purposes and which is intended to be used for said purposes.

That the proposed action on the part of the defendant is without authority or justification by law, and if permitted to proceed, will work irreparable injury to the Government of the Republic of Hawaii, and to the public rights and interests in navigation, shipping and wharfage, as above set forth, and is contrary to the sovereign rights of the Republic of Hawaii in the ownership of its property.

Wherefore your petitioner prays that the said Oahu Railway & Land Company, Limited, may be enjoined by the mandate of this Honorable Court to desist and refrain from proceeding as aforesaid, and that a writ of injunction issue prohibiting the defendant, its attorneys, servants and agents, from going on with the proceedings to condemn said property as aforesaid, and from entering upon, taking possession of or in any wise interfering with the rights of the Hawaiian Government in the premises aforesaid, or exercising on its part any rights of ownership, and for such other and further relief as to the court seems meet.

After injunction issued by Judge Stanley, on motion of plaintiff, and modification of same, injunction by defendant, demurrer, answer and decision dismissing the bill, such decision being submitted to by plaintiff, plaintiff took a general appeal to this Court. We do not, in view of the general appeal, deem it necessary to enlarge upon in detail the above steps taken in the case.

The exact question before us is whether the plaintiff has a right to a perpetual injunction to prevent the defendant company from condemning, under its alleged right to exercise eminent domain, the property in question. This property is admitted to be that of the Government of Hawaii and it is the land described under navigable water of the harbor of Honolulu. Whether it can be taken by the defendant company depends upon several considerations. If the property in question is not

subject to the defendant's right of condemnation the injunction was properly issued and should be made perpetual. This was the view of this Court in *Haw. Com. & Sugar Co. v. Kahului R. R. Co.*, page 479, *ante.*

In order to ascertain whether the property in question is subject to defendant's condemnation proceedings, we must first consider the nature of the property. That the harbors and channels of this country are government property and that such property as well as harbor improvements, construction and repair of public wharves, &c., are under the care and supervision of the Minister of the Interior is evidenced by Secs. 160, 162, 166, 167, 169, 506 and 507 of the Civil Laws of 1897.

It is not denied that the defendant company is under the general Railroad Act of 1878, and has a contract with the Minister of Interior, and has the right to condemn property for public use of the railroad. It holds as the agent of the state the delegated right to exercise eminent domain.

Judge Cooley defines Eminent Domain to be "the rightful authority which exists in every sovereignty to control and regulate those rights of a public nature which pertain to its citizens in common, and to appropriate and control individual property for the public benefit," &c. Cooley, Const. Lim., Sec. 524, 2d Ed. This author also says that some of those are complete without any action on the part of the state; as is the case with the rights of navigation in its seas, lakes and public rivers, and no specific legislative authority is required in order that the government may use public property for public use, and there is no judicial control over the fact or manner of such use.

We wish to distinguish if possible between the right of the defendant company to exercise eminent domain over property of individuals and property of the state itself. The bill alleges that the "land and right of way proposed to be appropriated by the defendant are being used for public purposes, to wit, for the sailing, navigation and anchorage of vessels," and that the use to which the property is now being put and the use to which it is about to be put is a "more necessary public use than that

which it is sought to be appropriated by the defendant." The
defendant denied this and was allowed by the court below under
plaintiff's objection, to adduce evidence tending to show that
defendant had better plans for harbor improvement and dock
facilities and that plaintiff had none. We think that the court
made the mistake in considering that the question here was one
of "public use" against another public use and that the asser-
tion of the plaintiff's public use as superior to defendant's was
a traversable fact. The evidence on this point was improperly
admitted and we have not considered it.

It is broadly stated by Randolph (Eminent Domain, Sec. 57)
that the property of the state is not subject to the right of
eminent domain, because it is already held for such uses as
the state may designate. Now the right of the defendant com-
pany to condemn private property for public use exists only
because this right has been delegated to it by the state, through
its legislature. The defendant exercises this authority only as
the state's agent and in pursuance of the state eminent domain.
The defendant cannot exercise this right against the very
authority that transferred it to defendant, except by its express
consent. On principle, the defendant has no authority to con-
demn property already subject to public uses. The doctrine
that land of the state held for sale or settlement may be taken
for railroad purposes but not such land as is already appropriated
for special uses of the government, seems to be sustained by
text writers and many adjudged cases. Elliot, R. R. Sec. 765;
Randolph Em. Dom., Secs. 50-51; *U. S. v. Chicago*, 7 How. 82.

In this case the court said, "It is not questioned that land
within a state purchased by the United States as a mere proprie-
tor, and not reserved or appropriated to any special purpose, may
be liable to condemnation for streets or highways like the land
of other proprietors, under the rights of eminent domain." In
order to authorize such condemnation, the court say that "it
must be for a public object, clearly superior or paramount, or
to which preference is expressly given by law or the constitu-
tion," and the court enjoined the opening of streets in Chicago
through land appropriated by the Federal Government for

"Fort Dearborn," and the court say further that "it is our duty to support the general government in the exercise of all which is plainly granted to it and is necessary for the efficient discharge of the great powers intrusted to it by the people and the state."

The case before us does not raise the question whether the public lands of the government held for rental, sale or settlement can be condemned by the defendant, in the exercise of eminent domain, and we need not further discuss it. We are limited to the exact question whether the land under the navigable waters of the harbor of Honolulu can be so condemned.

We find much light upon this question from the case of the *Illinois Central R. R. v. Illinois,* 146 U. S. 387, decided in 1892. The rights of the State of Illinois, the City of Chicago and of the Illinois Central R. R. in the harbor of Chicago were discussed and the question was "whether the legislature was competent to deprive the state (by grant to the railroad) of its ownership of the submerged lands of the harbor of Chicago, and of the subsequent control of its waters. or, in other words, whether the railroad corporation can hold the lands and control the waters by the grant against any future exercise of power over them by the state." We quote from the decision as follows:

"That the state holds the title to the lands under the navigable waters of Lake Michigan, within its limits, in the same manner that the state holds title to soils under tide water, by the common law, we have already shown, and that title necessarily carries with it control over the waters above them whenever the lands are subjected to use. But it is a title different in character from that which the state holds in lands intended for sale. It is different from the title which the United States hold in the public lands which are open to preemption and sale. It is a title held in trust for the people of the state that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties. The interest of the people in the navigation of the waters and in commerce over them may be improved in many instances by the erection of wharves, docks and piers therein, for which purpose the state may grant parcels of the submerged lands; and, so long as their disposition is made for such purpose, no valid objections can be made to the

grants. It is grants of parcels of lands under navigable waters, that may afford foundation for wharves, piers, docks and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the state. But that is a very different doctrine from the one which would sanction the abdication of the general control of the state over lands under the navigable waters of an entire harbor or bay, or of a sea or lake. Such abdication is not consistent with the exercise of that trust which requires the government of the state to preserve such waters for the use of the public. The trust devolving upon the state for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the state for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.

"A grant of all the lands under the navigable waters of a state has never been adjudged to be within the legislative power; and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation. The state can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace. In the administration of government the use of such powers may for a limited period be delegated to a municipality or other body, but there always remains with the state the right to revoke those powers and exercise them in a more direct manner, and one more conformable to its wishes. So with trusts connected with public property, or property of a special character, like lands under navigable waters, they cannot be placed entirely beyond the direction and control of the state.

"Any grant of the kind is necessarily revocable, and the exercise of the trust by which the property was held by the state

can be resumed at any time. Undoubtedly there may be expenses incurred in improvements made under such a grant which the state ought to pay; but, be that as it may, the power to resume the trust whenever the state judges best is, we think, incontrovertible. The position advanced by the railroad company in support of its claim to the ownership of the submerged lands and the right to the erection of wharves, piers and docks at its pleasure, or for its business in the harbor of Chicago, would place every harbor in the country at the mercy of a majority of the legislature of the state in which the harbor is situated.

"We cannot it is true, cite any authority where a grant of this kind has been held invalid, for we believe that no instance exists where the harbor of a great city and its commerce have been allowed to pass into the control of any private corporation. But the decisions are numerous which declare that such property is held by the state by virtue of its sovereignty, in trust for the public. The ownership of the navigable waters of the harbor and of the lands under them is a subject of public concern to the whole people of the state."

The people of Hawaii hold the absolute rights to all its navigable waters and the soils under them for their own common use. See *Martin v. Waddell,* 16 Pet. 410. The lands under the navigable waters in and around the territory of the Hawaiian Government are held in trust for the public uses of navigation. *Stockton v. Baltimore & N. Y. R. R.* 32 Fed. Rep. 9.

It will be noticed that in the opinion of the *R. R. v. Illinois* above quoted from the 146 U. S. an exception is mentioned to the inalienable character of the state's right to submerged lands. The court concedes that the state can grant parcels of land under navigable waters that may be used for foundations of piers, wharves, &c., in order to subserve the public interest, and which do not substantially impair the public interest in the lands and water remaining. The court also observes that there can be no irrepealable contract in a conveyance of property by a grantor in disregard of a public trust, in which he was bound to hold and manage it (p. 460).

Let us consider whether there is in the case before us any grant direct or implied by the legislature or the executive under legislative authority, to the defendant of the navigable waters

of Honolulu harbor. Neither the charter of the defendant company nor the contract with the government make the grant in express terms. It is contended that the Hawaiian railroad statute, Chap. 43, Sec. 6, Civil Laws, gives the defendant the right to enter upon all such lands as shall be required for the construction, maintenance and operation of its road, and Sec. 8, prescribing the notice to owners of land of the defendant's intention to take such lands, concludes as follows: "For the purpose of receiving such notice the Minister of Interior shall be deemed the owner of such land." We are of opinion that the words above quoted ought not to be construed to mean more than their fair import. The right of condemnation of property can only be used for a public purpose and the line of the railroad is by statute subject to the approval of the executive. If the lines go over lands of the government and it approves of the location, then it consents to its land being taken and the minister is the appropriate person to receive notice in order that he may arrange for the damages in compensation.

But it is claimed that the location of the "terminal division" of the defendant's railroad includes a portion of the land under navigable waters and was an unconditional approval by the executive council.

What is the evidence on this point?

Negotiations between plaintiff and defendant as to the location of the terminal division of the Oahu railroad began in 1889. The correspondence is voluminous, and we can only make extracts from it.

In July, 1889, the defendant passed a resolution for its terminal division extending to deep water on the westerly side of Honolulu harbor, submitting the plan to the Cabinet for its approval.

July 20th the defendant wrote to the Minister of the Interior changing the location of the terminal division as by the above mentioned resolution.

On the 26th the Company wrote again saying that as the Minister was opposed to the condemnation of any part of the

water front, and, "as the Company desired to act in accord with such views when possible," it made a proposition for a lease for the construction of a wharf.

On August 22d, the plaintiff replied saying that the Government, "while recognizing the value to the public of your railroad, is not willing to alienate for any specific time its control over any portion of the water front of Honolulu harbor," and stating that the Government was "willing to do all that was reasonably necessary to allow your road to reach deep water," and was willing to grant the privilege of erecting a wharf on certain conditions named.

August 24th the defendant Company said that "the Oahu Railway & Land Company agrees with your Excellency with regard to the unwillingness of the Government to alienate any portion of the water front of Honolulu harbor, &c., and the company is perfectly willing to have such front for a limited term." At the end of this letter it says: "In order to avoid any future misunderstanding or complication I suppose there is no question as to what is understood between the Government and the Oahu Railway & Land Company as to the amount of property the Government may take in the future. That is to say, that it will only cover premises which now belong to the Government, and in no case extend over and give the Government the right to take any portion of the wharf property of the Company erected upon lands purchased by the Company or taken under railroad acts belonging to other parties." This refers to the property to be surrendered on the expiration of the proposed lease.

September 3d plaintiff writes to defendant as follows: "As to what property is to be covered by the agreement the Government claims all of the deep water front in that portion of the harbor, and cannot therefore admit that the Company can have any wharf property not upon Government property."

On the 29th of September the defendant sent papers describing the final location of the terminal division, with map, for approval, and on the 30th plaintiff replied that it was approved

by the cabinet, "Provided, however, that this approval does not apply or in any wise bind the Government in and concerning the location of the wharves proposed to be erected by the Oahu Railway & Land Company, nor as. to the amount and location of the water front to be occupied by the Company, the location of such wharves and water front being the subject of special agreement now in process of negotiation between the Government and Company."

The negotiations between the Government and the railroad company as to the amount and location of the water front to be occupied by the railroad company thereafter continued and culminated in a lease which was agreed upon November 30th, 1889, but not finally executed until the 15th of March, 1890.

The final approval by the Cabinet of the terminal division without expressed qualification in the approval was not made until an agreement as to what it would cover had been arrived at. This is evidenced by the two letters of the Minister of the Interior to the railway company.

DEPARTMENT OF INTERIOR,
Honolulu, H. I., November 30, 1889.
OAHU RAILWAY & LAND COMPANY.

Gentlemen:—I have the honor to acknowledge the receipt of your communication of the 29th inst. enclosing a map and notes of survey of the location of the proposed terminal division of your railroad and requesting that the same be approved by the Cabinet in accordance with law. In reply I would say that the same is hereby approved. Such approval has been duly endorsed upon the specifications and map submitted and placed on file in this office. In case you desire a copy of the same a certified copy will be furnished you upon presentation of the same for signature.

I have the honor to remain, your obedient servant,
(Sig.)                    L. A. THURSTON, Minister of the Interior.

Memorandum on file, doubtless referring to the above:
Nov. 29th, 1889. Letter from W. R. Castle, President O. R. & L. Co. enclosing map and notes in re Terminal Division Honolulu harbor.
(Sig.)                            E. S. BOYD, Clerk.

DEPARTMENT OF INTERIOR,

Honolulu, H. I., November 30, 1889.

OAHU RAILWAY & LAND COMPANY.

Gentlemen:—I have the honor to acknowledge the receipt of your communication of the 29th inst. containing draft of agreement between the Government and the Company concerning the proposed water front upon which the Company desire to locate, and to say that with the slight pencil amendments made upon the face of the same, the same meets with the approval of the Government and duplicate copies of the same will be executed upon presentation for signature.

Enclosed herewith the copy submitted for examination.

I have the honor to remain, your obedient servant,

(Sig.)          L. A. THURSTON, Minister of the Interior.

To explain the situation more fully we set out the lease agreed upon:

"An Indenture made this 15th day of March, 1890, by and between Lorrin A. Thurston, Minister of the Interior of the Hawaiian Kingdom, acting for and on behalf of the Hawaiian Government and by and with the consent of the Cabinet, of the first part, lessor, and the Oahu Railway & Land Company, a corporation established and existing under and by virtue of the laws of the Hawaiian Islands, hereinafter called the "Company," of the second part, lessee;

Whereas, the Company, acting under the authority conferred upon it by law has located a branch of its railroad from its station and depot in Honolulu to the line of deep water in Honolulu harbor, the same being known as the terminal division of said Company, which location has been approved by the Cabinet;

And whereas, said location includes certain lands of the Hawaiian Government upon which the Company desires to erect wharves and storehouses and to make other improvements; and it has been agreed between the parties hereto that a lease of said premises should be executed between them on the terms below set forth, and that the obligations herein assumed by the Company shall be taken by the lessor in full of damages for such location;

Now therefore, this indenture witnesseth:    That said party of the first part in pursuance of and in consideration of the premises, and of the rent below reserved, and of the authority conferred upon him by Chapter 29 of the laws of 1878 entitled

"An Act to promote the construction of railroads," and by Chapter 62 of the laws of 1888 entitled "An Act to authorize and promote the construction of steam railroads on the Island of Oahu," and of all other authority in him by law vested, doth hereby let, demise and lease unto said party of the second part, its successors and assigns all of that tract of land now covered by water situated on the west side of the Honolulu harbor, described as follows:

. Beginning at center of concrete pillar marking the southwest corner of Royal Patent 1879½, W. L. Lee, thence running by true bearings: N. 71° 39′ E. 471 feet along Royal Patent 1879½; S. 18° 21′ E. 100 feet; S. 74° 40′ W. 494 feet; S. 45° 00′ W. 264 feet; N. 11° 50′ W. 100 feet more or less to the limit of Kahololoa fishing ground at a depth of five feet at mean tide; thence running northeasterly along said line of five feet depth to its intersection with line makai side of Royal Patent 1879½; thence direct to initial point. Area 1 3-10 acres more or less.

And the party of the first part doth hereby grant unto the party of the second part, the right to erect a wharf or wharves on the water frontage of said premises extending into Honolulu harbor not more than three hundred feet; and the right to collect tolls and wharfage for the use of the same; and the right to fill in said premises within the lines of said survey with earth, gravel or other material, and to erect containing walls for the same, and to lay its rails upon said premises; and to connect the same with its railroad to Pearl River, and to make such other use of the same as does not conflict with the powers granted the Company by law or its charter.

To have and to hold with the appurtenances to the party of the second part, its successors or assigns, for and during the term of ten years from the date hereof, at the rental of one dollar per annum, and for such further period thereafter until the Government shall pay or tender to the Company the value of the filling and improvements situate thereon estimated on the basis below set forth at the same rate. Provided, however, that nothing herein contained shall be construed to authorize the assignment of these presents to any person or persons other than the owners or operators of the railway of the Company now constructed on the Island of Oahu.

And it is mutually agreed by and between the parties hereto as follows:

1. That the Government shall have the right to take posses-

sion of the land hereby demised or any part thereof, together with the improvements on the same or on any portion which may be so taken at any time after giving to the company ninety days' notice of intention so to do, and the payment or tender to the company of the value of such improvements.

Provided, however, if the Government shall take a portion only of said premises it shall take for every foot of water front the entire depth of the lot except such portions as are used for railroad purposes and except such buildings as may not be required for wharfage purposes; the remaining portions, if any, to remain in possession of said lessee until taken and paid for.

2. The improvements to be so valued and paid for by the Government in case they shall resume possession of said premises or any part thereof shall include:

A. All earth and rock filling and retaining walls;

B. All wharves;

C. All buildings and other permanent improvements situate on such filled land or wharves necessary or appropriate for the use of such premises as a wharf or for storage purposes.

3. The basis of arriving at such value shall be as follows:

The amount to be paid for earth and rock filling and retaining walls shall be the actual cost price of the material and of excavating, transporting and placing the same in position.

The amount to be paid for wharves, building and erections shall be such as agreed upon, or, in default of agreement, it shall be such sum as shall be named by a Board of three disinterested arbitrators, one of whom shall be chosen by each party and the third by the two so chosen, whose award shall be subject to an appeal to the Supreme Court; but in no event shall the price so to be paid exceed the actual cost price of the material used and of constructing and of placing the same in position; the Company hereby agreeing to keep all such buildings, structures and improvements to be erected by it in good repair, and the cost of such repairs shall not be included in any award so provided for, but shall be incurred and borne by the Company.

4. For the purpose of assisting in ascertaining the value of the improvements as above indicated, the Company shall keep a separate account showing in an itemized statement of what such improvements consist, and the several amounts paid therefor, and shall at the end of each month, file at the Interior Office, a copy of such account for the month then past.

The charges of the Company for labor and materials so used

shall not exceed the regular current market rate at the time the expenditure is made.

5.  So long as the Company retains the possession of the said premises, wharfage shall be charged to all vessels coming to the Company's wharves at the same rate as charged by the Government at its wharves.

6.  After the Government shall have taken possession of said premises under the power above given, or after the expiration of said term, the Company shall have the right to use, during the term of its franchise, so much of the said premises for storage, wharfage and transportation as may be necessary for the purpose of the Company, for which the Government shall charge the Company the same price that is charged by the Government for like privileges; provided, however, that nothing in this section contained shall prevent the Government from allowing the use of said premises by other persons at such times and in such manner as will not interfere with the business of the Company.

7.  Notwithstanding the above demise if it should be deemed necessary at any time by the Minister of the Interior, to change the location of said wharf or wharves or of any of the filled in premises for the benefit or improvement of the harbor of Honolulu, the Government shall have the right at its own expense to make such change without paying to the Company any consequential damages for loss of use of said premises, loss of business or otherwise, or any damages other than the kind specified above.

8.  The Company shall submit to the Minister of the Interior the plans and specifications of all fillings, walls and other structures proposed to be placed upon said premises and the plan showing the proposed location of the same and the proceeding with the construction of the same shall be subject to the approval by the Minister of the Interior of such plans and location.

9.  The Company shall not fill in any land south and (or) west of the fish pond lying south of the Oahu Jail, being the land other than that herein demised, until permission so to do shall have been received from the Minister of the Interior in order that definite plans concerning the final location of walls and the improvement of this portion of the harbor may be arrived at and adopted.

The Company for itself, and its successors and assigns, hereby covenants with the lessor and his successors in office and assigns, that upon the expiration of the said term of the franchise of said Company, or sooner upon the performance by the Govern-

ment of the conditions upon its part to be kept and performed, the lessee will peaceably quit and deliver up to the said Minister, or his successors in office or assigns, all. of the premises hereby demised, and the appurtenances thereon situate and thereto belonging.

In witness whereof the party of the first part has hereto set his hand and caused the seal of the Department of the Interior to be hereunto annexed, and the party of the second part has caused its corporate name and seal to be hereunto placed by John H. Paty, president, and Curtis P. Iaukea, treasurer, the day and year first above written.

(Signed by all the Cabinet Ministers and the president and treasurer of the O. R. & L. Co.)

The status of the parties in this case continued under the lease until September 27th, 1897, when the following notice was sent by plaintiff to defendant:

DEPARTMENT OF INTERIOR,

Honolulu, H. I., Sept. 27, 1897.

B. F. DILLINGHAM, ESQ.,
        General Manager, O. R. & L. Co.

Sir:—The Hawaiian Government hereby notifies the Oahu Railway & Land Co., of its intention to take possession at the end of ninety days from this date, of the land lying on the west side of the Honolulu harbor, demised to the Company by the Government on the 15th day of March, 1890, by lease of that date, together with all the improvements on the same, not including the coal hoisting plant.

The Government estimates the value of such improvements at $16,560, which sum it will tender and pay at the end of such ninety days; or, in lieu thereof such sum as shall be agreed upon; or in default of agreement such sum as shall be named by a board of arbitrators, according to the provisions of said lease.

I have the honor to be, your obedient servant,

(Sig.)                    J. A. KING, Minister of the Interior.

On November 9th, 1897, plaintiff received from defendant company, the following communication, being notice of intention to condemn:

"To J. A. King, Minister of the Interior of the Republic of Hawaii, and the Republic of Hawaii, and whom it may concern:

Notice is hereby given that (after the expiration of thirty (30) days from the date hereof) the Oahu Railway & Land Company intends to take, and hereby takes and condemns the portion of land below described from the land owned by the Republic of Hawaii, situated in and adjacent to Honolulu harbor, Island of Oahu, as allowed by law and its charter, for the purpose of constructing, maintaining and operating piers, jetties, stations, sidings, wharves, warehouses and other houses, yards, engines, machinery, signal posts and other apparatus, works and conveniences proper in connection with its railway on the Island of Oahu and the operation thereof.

Notice is hereby given that (after the expiration of thirty (30) days from the date hereof) the Oahu Railway & Land Company intends to take and appropriate, and hereby takes and appro priates the perpetual right for the Oahu Railway & Land Company, its successors and assigns, to make, and if necessary, to maintain and use a right of way by water for vessels and all other water craft of any draft whatsoever over and upon all lands and water (the same being owned by the Republic of Hawaii) between the strip or portion of land hereinabove condemned, and containing seventy-nine hundredths (79-100) acre and every portion thereof, and deep water in Honolulu harbor and every part thereof, and the right for said Company, its successors and assigns to sail, haul and otherwise transport vessels and all other water craft of whatsoever draft across and over said right of way and every portion thereof.

The amount of land to be taken outside of said water way amounts to seventy-nine hundredths (79-100) acre, and the Company estimates the value of such land to be $15,000, which amount will be paid to you at the office of the Company in Honolulu, or at such place as you may be pleased to designate.

The Company estimates the value of the perpetual right of way by water aforesaid to be $100. which amount will be paid to you at the office of the Company in Honolulu, or at such place as you may be pleased to designate.

Honolulu, November 9th, 1897.

Description of land to be taken as aforesaid, outside of the perpetual right of way by water aforesaid:

Beginning at a point formerly marked by a concrete monument at the southeast corner of L. C. A. 11,225, R. P. 1879½;

thence S. 71° 39′ W. 471 feet along said L. C. A. 11,225; thence S. 31° 30′ E. 25 feet; thence S. 64° W. 91 feet; thence S. 56° W. 84 feet; thence S. 35° W. 118 feet; thence S. 11° 50′ E. ·25 feet; thence N. 36° 15′ E. 175 feet; thence N. 70° 17′ E. 588 feet; thence N. 18° 21′ W. 54 feet to the initial opint.

(Signed by president and treasurer O. R. & L. Co.)

Reference to the map accompanying the application for approval of Oct. 29th, shows that some 7.5 acres of navigable water of the harbor was covered in the proposed terminal division, and the letters of the Minister of the Interior of October 30th, recited in an earlier part of this decision, approved the location with the proviso that it should not bind the Government as to the amount and location of the water front to be occupied by the Company. The Company then reduced the area of the navigable water to be included in the terminal division to 1 3-10 acres, which as we understand it was the precise area demised by the lease. A portion only of the same is sought to be taken by condemnation of the Railroad Company being an area of 79-100 of an acre, the front line being considerably landward of the front line of the demised premises; also the perpetual right of way from the proposed condemnation to and over every part of the harbor. It is to be regretted that the original map showing the thus amended terminal division cannot be found with the approval of November 30 endorsed upon it. By agreement of counsel however, a copy made from the original was admitted in evidence. The lease itself recites that "Whereas the Company acting upon the authority conferred upon it by law has located a branch of its railroad from its station and depot in Honolulu to the line of deep water in Honolulu harbor, the same being known as the terminal division of said Company, which location has been approved by the Cabinet," and the description of the harbor line is along the "depth of five feet at mean tide."

It is contended on the part of defendant that the approval of the location was unconditional and therefore the State has given its consent to the railroad to condemn whatever land is

included in its limits and counsel say that "the giving and accepting of the lease suspended all proceedings for condemnation, but it did not have the effect of destroying the approval of the location." But the very object of the lease was to prevent the defendant from acquiring the fee of the land and the Government was even unwilling to part with it by lease for any "specific time" and only agreed to lease it to the Company for ten years and thereafter as long as the Company's franchise for a railroad continued, upon the condition that the premises should be surrendered to the Government upon 90 days' notice and tender for value of improvements. It would be inequitable to consider the agreement for the use of the land as separate and distinct from the approval of the location. The two acts were contemporaneous and taken together constitute the status of the respective parties. It is clear to our minds that the approval of the location (of the terminal division) to the line of deep water, including the land sought to be condemned would never have been given by the Government, had not the lease been agreed upon.

It is to be noticed that only a small portion of the land of the State under deep navigable water was demised to the Company, or is included in the "location." But the Company seeks to condemn the perpetual right of way for its water craft from the land sought to be condemned to and over all the harbor of Honolulu. Does this mean an exclusive right of way, or a priority in the use of the right of way over the waters of the harbor? This, as we have seen above, is not subject to condemnation and it is doubtful if the State as a trustee for the public could consent to part with it.

The evidence seems to us to show that the Government declined to let any part of the land under navigable water of the harbor to go out of its control, and that the defendant Company agreed with this policy. The Government has never given its consent to anything that would deprive itself of this right.

It is evident from the correspondence and the final agreement in the lease of March 15th, 1890, that the Government was willing to assist the defendant Company with wharfage facilities

so far as possible without compromising its paramount right to navigable water. Very likely also it had not then an appropriation or funds to do the wharf building itself and was not then ready with any plan for harbor improvement, but when the Government was ready to increase wharf room and otherwise improve the harbor it gave the notice required in the lease for the surrender of the demised premises.

The citations made that a covenant by lessor for quiet enjoyment is not broken by its assertion of the right of condemnation do not apply here for the lessor here does not seek to condemn. Other citations notably *Kip v. N. H. R. R.* 67 N. Y. 227, which hold that the covenant by lessee to return the land at the end of the term is no bar to condemnation proceedings is not in point here, considering the public nature of the property in question. All the cases cited are proceedings by a party having the right to eminent domain under which to condemn private property. *De Campe v. Hibernia R. R. Co.* 47 N. J. L. 43; *Tait's Exec. v. Central Asylum* 102 Mass. 19..

Argument is made that the defendant has the right to build "wharves" by force of its charter which specially allows the defendant to do this. But this must mean the defendant has the right to build wharves (if this means wharves over deep harbor water) upon land to which they may have become entitled by grant or consent of the State. The enumeration of "wharves" among other authorized structures, is not sufficient of itself to constitute a concession by the State of the right of the defendant to condemn the property upon which the wharves may be built.

It is also contended by defendant that the defendant, as a riparian proprietor, it owning land bounded by the navigable water of the harbor, has the right of access to the navigable part and to build wharves in furtherance of this right. The main case is *Yates v. Milwaukee*, 10 Wall, 497.

Without expressing any view on this matter, we say that the case before us does not raise this issue, which is the right of the plaintiff to enjoin defendant's condemnation proceedings and defendant would not seek to condemn that which it has a right to use.

47

Having found that the defendant has no right of condemnation of the property in question, we hold that a perpetual injunction should be issued in accordance with the views herein expressed.

Decree accordingly.

*A. S. Hartwell* and *Attorney-General Smith* for plaintiff.

*F. M. Hatch*, and *Kinney, Ballou & McClanahan* for defendant.

### CONCURRING OPINION OF JUDGE PERRY.

Assuming that our statute or statutes purport to grant to the Oahu Railway & Land Company the right to condemn property whether belonging to the Government or to others, the exercise of such right by the Company is nevertheless confined by statute to such property as lies within the lines of its road as approved by the Cabinet. I concur in the conclusion reached in the foregoing opinion that the Cabinet has not unconditionally approved the location of the respondent's road or its wharves over the land which is the subject of these proceedings so as to empower the respondent to condemn and take the said land for its own use and, therefore, in the conclusion that the respondent has no right of condemnation of the property in question and that a perpetual injunction should be issued against the respondent, as in the above decision set forth; but think that the adoption of this view by the Court renders it unnecessary to express an opinion on the question of whether or how far the legislature can deprive the State (by grant to private individuals or companies) of its ownership of the submerged lands under the navigable waters of the harbor of Honolulu, or on the question of the superiority or otherwise of the Government's use or proposed use of the property in controversy.