JOSEPH O. CARTER, WILLIAM F. ALLEN, WILLIAM O. SMITH, SAMUEL M. DAMON. and ALFRED W. CARTER, TRUSTEES UNDER THE WILL OF BERNICE P. BISHOP, deceased, *v.* THE TERRITORY OF HAWAII.

SAMUEL M. DAMON *v.* THE TERRITORY OF HAWAII.

EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

SUBMITTED OCTOBER 7, 1902.     DECIDED NOVEMBER 15, 1902.

GALBRAITH, J., JOHN T. DE BOLT, CIRCUIT JUDGE, IN PLACE OF FREAR, C.J., DISQUALIFIED, AND W. J. ROBINSON, CIRCUIT JUDGE, IN PLACE OF PERRY, J., DISQUALIFIED.

The Hawaiian statutes giving konohikis, or landlords, special privileges in the sea fisheries adjoining their land were not grants of prop-

30-D

erty or covenants in the nature of grants but were public statutes in which no one could acquire a vested right.

The phrase "private property" used in these statutes denoted no more than the special rights, or privileges, given by the law over the sea fishery.

When the statutes were repealed by the Organic Act the konohiki, or landlord, no longer had any "private property" in such fishery.

Exclusive rights in a sea fishery surrounding these islands could not be acquired by prescription or ancient custom.

The konohiki's, or landlord's, "private property" in the sea fishery could not pass as an appurtenance to the land.

A Royal Patent containing, after the description of the land conveyed and before the habendum clause, a recital that "there is also attached to this land a fishery right in the sea adjoining" without express words of grant referring to the fishery does not convey any right in the fishery.

### OPINION OF THE COURT BY GALBRAITH, J.

The plaintiffs commenced these actions under Section 96 of the Organic Act for the purpose of establishing an exclusive right to the fisheries of Waialae-iki and Moanalua, Island of Oahu.

In the first case the plaintiffs as trustees of the Bishop Estate, claim a vested right as sole and exclusive owners in fee simple of the sea fishery, same not being a pond or artificial enclosure, situated within the reef adjoining the land of Waialae-iki, setting out a description by metes and bounds; and further allege in their petition that plaintiffs' claim consists of the right each year to set apart for themselves for their sole and exclusive use within the fishing grounds described, one species or variety of fish natural to said fishery, giving public notice of the kind and description of the fish so chosen or set apart; and also the right in lieu of setting apart some particular fish to their exclusive use to prohibit, upon consultation with the tenants of their land, all fishing within such fishery during certain months of the year; and during the fishing season to exact from each fisherman one third of all the fish taken upon said fishing ground;

that from time immemorial the plaintiffs and their grantors by ancient custom and prescription have had an exclusive fishery within the bounds set out, subject only to the rights of tenants on the land of Waialae-iki; that the said fishery was originally appurtenant to the land of Waialae-iki awarded to A. Paki by Apana 3 of Land Commission Award No. 10,613 and confirmed by Royal Patent No. 3578; and that plaintiffs claim an absolute estate in fee simple in said fishery by purchase under various mesne conveyances.

In the second case the plaintiff makes a similar claim to the fishery situated at Moanalua and also sets up an additional ground for the claim of right, i. e., that the said fishery was confirmed to L. Kamehameha by Royal Patent No. 7858 under whom the plaintiff claims an absolute estate in fee simple in said fishery by purchase through various mesne conveyances and by descent.

The cases were tried to a jury in the Circuit Court. In the first the Judge granted defendant's motion for non-suit at the close of plaintiff's evidence. In the second a verdict was directed for the defendant. The plaintiffs excepted and come to this court on bills of exceptions. The cases were argued and submitted together.

In the first case the claim of plaintiffs is based on three grounds, to-wit: (1) That the right claimed is an appurtenance to their land; (2) that it is based on prescription or (3) on Ancient Hawaiian custom while in the second case these three grounds are relied on and an additional claim for the right is made i. e., a grant from the King.

It is contended on behalf of the Territory, and the ruling of the Circuit Judge seems to have been based on this theory, that in the second case the Patent for the land of Moanalua does not grant the fishery to the patentee and in both cases that the plaintiffs did not and could not acquire an exclusive right in the fisheries by prescription or by ancient custom, and that whatever right they enjoyed in the fisheries on June 14th, 1900, the time of taking effect of the Organic Act, was derived from the Hawaiian Statutes on the subject of fisheries and that these were

public statutes or laws unde which no one could acquire a vested right and that when the statutes were repealed all of the rights and privileges of the plaintiffs in the said fisheries were abrogated and annulled.

The provisions of the Organic Act on the subject are as follows, "Section 95. That all laws of the Republic of Hawaii which confer exclusive fishing rights upon any person or persons are hereby repealed, and all fisheries in the sea waters of the Territory of Hawaii not included in any fish pond or artificial inclosure shall be free to all citizens of the United States, subject, however, to vested rights; but no such vested rights shall be valid after three years from the taking effect of this Act unless established as hereinafter provided."

Section 96. "That any person who claims a private right to any fishery shall, within two years after the taking effect of this Act, file his petition in a Circuit Court of the Territory of Hawaii, setting forth his claim to such fishing rights, service of which petition shall be made upon the Attorney-general, who shall conduct the case for the Territory, and such case shall be conducted as an ordinary action at law.

That if such fishing right be established, the attorney-general of the Territory of Hawaii may proceed, in such manner as may be provided by law for the condemnation of property for public use, to condemn such private right of fishing to the use of the citizens of the United States upon making just compensation, which compensation, when lawfully ascertained, shall be paid out of any money in the Treasury of the Territory of Hawaii not otherwise appropriated."

The question of greatest difficulty presented by these cases is to determine whether or not the rights of the plaintiffs in the respective fisheries were properly "vested rights" within the saving clause of Section 95, of the Organic Act.

By the Common law the title and dominion of the sea and navigable rivers and arms of the sea within the Territorial jurisdiction were in the King who held the same in trust for his subjects who had a common right of navigation and fishery therein.

This jurisdiction was held to extend one marine league from the beach at low water mark. 2 Blackstone 52; Gould on Waters, Sec. 3; *Rogers v. Jones,* 1 Wend. 237 at 256; *Shively v. Bowlby,* 152 U. S. 1; *The King v. Parish,* 1 Haw. 58.

Although the claim to an exclusive right in a sea fishery has been the subject of much litigation and of conflicting decisions the weight of authority seems to hold that at common law such a right might be acquired by grant or by prescription which presumes a grant. Gould on Waters, Sec. 189, and cases cited in note: *Rogers v. Jones, supra:*

The Supreme Court of New York has held that by the common law the King had the right to grant the soil under navigable water, and with it the exclusive right of fishery. *Brookhaven v. Strong,* 60 N. Y. 56. A grant made by a Colonial Governor and confirmed by Act of Assembly was held to vest the title to an exclusive fishery in the grantee. *Robins v. Acherly,* 91 N. Y. 98. The holding of the New York Courts on this question was followed by the Supreme Court of the United States in *Lowndes v. Huntington,* 153 U. S. 1.

It is said by Woodworth, J., in case of *Rogers v. Jones, supra,* "It is well known that numerous grants have been made from time to time by the Commissioners of the land office of lands under the waters of the Hudson, all which have proceeded on the ground that it was the undeniable right of the people of this state to make such grants. Until very lately, I have not understood that the power was questioned. It is here proper to observe that this principle does not at all conflict with the doctrine laid down by writers on national law, who declare the air, running water, the sea, etc., are common property (Vattel, b. 1. Ch. 23, Sec. 280, 287. Grotius, b. 2 Ch. Sec. 3.) The same writers, however, admit that the various uses of the sea near its coast render it very susceptible of property; and rivers are susceptible of property, because confined in banks; such places may be appropriated by the people to whom they belong and the productions within reach, in the same manner as the land they inhabit." p. 156.

Kamehameha III, who ruled the Hawaiian Islands before there was any written laws or Constitution, as well as after the adoption of a written Constitution, was in the fullness of the common law phrase "the universal lord and original proprietor of all lands in his kingdom." He was the source of title. He could give and take from. His will was law. None of his people held allodial titles prior to 1840. There is little, if any, doubt that he had the power to grant exclusive fisheries to any of his subjects if he desired to do so. (*Territory v. Liliuokalani, ante* 88. *Brown v. Spreckels, ante,* 400), although there is a declaration by Chief Justice Judd that tends strongly to indicate that this Court at that time (1899) held to the contrary view. "The people of Hawaii," said the Chief Justice, "hold the absolute rights to all its navigable waters and the soil under them for their own common use. See *Martin v. Waddell,* 14 Pet. 410. The lands under navigable waters in and around the Territory of the Hawaiian Government are held in trust for the public use of navigation. *Stockton v. Baltimore & N. Y. R. R.,* 32 F. 9." *King v. Oahu Railway & Land Co.,* 11 Haw. 725.

Admitting that the plaintiffs might have obtained the right claimed by grant the question arises. Did they acquire such right? Such a grant would be against the public right and under the well established rule of construction requiring all such grants to be construed most strongly against the grantee it follows that such right if it exists must appear by express terms of the grant.

Much was said at the hearing and in the briefs relative to these islands surrounded by the sea, teeming with food for the inhabitants, and of the relative importance of the products of the sea to the life of the people over those of the land. All this was and is of much interest but it does not appear how it in any material way leads to a solution of the issues presented. Since it appears that whatever the customs may have been or the rights and privileges enjoyed by the chiefs, nobles and common people in the fisheries prior to the year 1839, at that

time they were all revoked and cancelled, and a statute passed to regulate and govern them.

The first written law on the subject of fisheries in these islands was adopted by the king, nobles and chiefs on the 7th day of June, 1839. In this statute it is declared that,

"His Majesty the King hereby takes the fishing grounds from those who now possess them from Hawaii to Kauai, and gives one portion to the common people, another portion to the landlords, and a portion he reserves to himself." And further that,

"These are the fishing grounds which His Majesty the King takes and gives to the people: The fishing grounds without the coral reef, viz: the Kilohee grounds, the Lohee grounds, the Malolo grounds, together with ocean beyond.

"But the fishing grounds from the coral reef to the sea beach are for the landlords and for the tenants of their several lands but not for others."

An examination of this Act (Chap. 3, Laws of 1839) will show that it was intended to govern the subject of fisheries completely. Experience demonstrated that it was incomplete and various amendments were adopted on April 1st, 1841. Again in 1845 another act was passed on the subject more clearly defining the rights of the several parties. Section 1 of this last Act defines the fishing ground of the people to be "the entire marine space without and seaward of the reef upon the coast of the several islands," etc. Section 2 of this act reads, "The fishing grounds from the reefs, and where there happens to be no reefs from the distance of one geographical mile seaward to the beach at low water mark, shall in like manner be considered private property of the landlord whose lands by ancient regulation belong to the same; in the possession of which private fisheries the said landlords shall not be molested except to the extent of the reservations and prohibitions hereinafter set forth.

"Sec. 3. The landlord shall be considered in like manner to hold said private fisheries for the equal use of themselves and of the tenants on their respective lands; and the tenants shall be at liberty to use the fisheries of their landlords, subject to the restrictions in this article imposed."

The other sections give the landlords the right each year to

set apart for themselves one specie or variety of fish natural to the fishery and to give public notice of this fact by proclamation, etc., and fixing penalties against landlord and tenant for violation of the Act. Also defines the species of fish designated as the royal fish and prescribes that these shall appertain to the government and for a division of them between the king and the fishermen, and makes extensive provisions relative to the "king's tabu," etc.; providing for the appointment of fishery agents to "exact and receive of all fishermen for the use of the royal exchequer during the legalized fishing seasons the one-half part or portion of all protected fish taken without the reefs," etc.

Time and experience demonstrated to the satisfaction of the King that it was not profitable for the government to engage in the fishing business, so on July 11, 1851, the King approved an act granting to the people the rights of piscary belonging to the government. The second section of this Act reads: Sec. 2. "All fishing grounds pertaining to any government land, or otherwise belonging to the government, excepting only ponds, shall be and are hereby forever granted to the people for the free and equal use of all persons; provided, however, that for the protection of such fishing grounds the minister of the interior may tabu the taking of fish thereon at certain seasons of the year."

Another Act was passed the same year, (1851), entitled "An Act to protect the people in certain fishing grounds," and reads in part as follows: "Section 1. That no person who has bought or who may hereafter buy any government land, or obtain land by lease or other title from any party, has or shall have any greater right than any other person resident in this kingdom over any fishing grounds not included in his title, although adjacent to said land. The fish in said fishing ground shall belong to all persons alike, and may be taken at any time, subject only to the tabu of the minister of the interior.

"Section 2. If that species of fish which has been tabooed by any konohiki shall go into the grounds which have been or may be given to the people, such fish shall not be tabooed them. It shall only be tabooed when caught within the bounds of the

konohiki's private fishery. Nor shall it be lawful for a konohiki to taboo more than one kind of fish upon any fishing grounds which lie adjacent to each other."

The Civil Code of 1859 embraced all the laws then in force in the islands on the subject of fisheries. Section 384 of the Civil Code is a verbatim copy of Sec. 2 of the Act of 1851, above quoted, and Sec. 387 is a copy of Sec. 2 of the Act of 1845 except the word "konohiki" is substituted for the word "landlord" used in the original enactment. The other sections hereinbefore quoted were included in this chapter of the Civil Code. All of these laws without material change were carried forward and are published as Chapter 84 of the Penal Laws of 1897. These statutes on the subject of fisheries had been in force some of them for more than half a century and all of them for most of that time, when repealed by Sec. 95 of the Organic Act, June 14, 1900.

It is clear from a review of these statutes that the following are necessary inferences, to-wit, that the plaintiffs cannot base any claim to the fisheries on ancient custom or prescription; that no right that they may have possessed can antedate the Act of 1839; that all right in the fisheries of whatever nature that had been enjoyed by any subject prior to that date was revoked and annulled by said Act and that all claims must now date from the Act of 1839 or from some subsequent date.

There are only two grounds remaining on which the plaintiffs might sustain their claim, to-wit: (1) that it is based on grant or (2) was an appurtenance to the land.

It is argued that these statutes are in the nature of grants and are sufficient to vest title to the fisheries in the landlords and that the word "give" used in the Act of 1839, is a word of conveyance and was sufficient to pass title to the fisheries from the king to the konohiki and that the title so conveyed become a vested right within the meaning and intent of Sec. 95 of the Organic Act.

We do not agree with this contention. Aside from the absence of definite description of the alleged subject of the grant, and the absence of a definite grantee, the statutes them-

selves bear conclusive evidence that they were not intended as grants of property and that they were not intended to be more than appears from their plain terms, to-wit, grants of special privileges to persons who then were or might thereafter become landlords.

The statute of 1851 granting to the people certain rights of piscary shows a clear intent to make a grant both in the title and body of the law. Words of grant are used. "All fishing grounds," etc, "shall be and are hereby forever granted." If it had been the intention to convey an absolute right of property to the landlords by the other statutes, it seems that suitable words of grant would have been employed. That such words were not used can only be explained on the theory that a grant was not intended, and we so construe the statutes.

It is contended that the fishery was an appurtenance to the land and passed by deed or patent without special reference thereto in the conveyance.

The statute declares the fisheries within the reefs and for one mile from shore where there is no reef to be the "private property" of the konohiki or landlord. We understand the word *property* to be used in this statute in a general sense, meaning dominion over a thing. (1 Blackstone, 122; 2 *id.* 1.) "The word 'property' although in common parlance frequently applied to a tract of land or a chattel, in its legal signification, means only the *rights* of the owner in relation to it. It denotes a right over a determinate thing." Andrew's Am. Law, Sec. 96.

The phrase "private property" used in the law cannot mean more than the rights which the statute gave to the konohiki or landlord over the fishery and such private property could not be said to be held by contract or any covenant in the nature of a contract.

A parallel is sought to be drawn between the fishery statutes and the United States statutes permitting settlers to take up homes on the public domain. The analogy is not apparent. There is a wide distinction between the statutes and the rights that may be acquired under them. The United States home-

stead statute is not self-executing nor is it a grant of land to the homesteader. It provides a method by which a qualified person who complies with the terms prescribed may acquire title to land. The title passes from the government to the homesteader when the patent issues and not before. *Shiver v. The United States*, 159 U. S. 491. Again the one statute relates to land that may be possessed, occupied, cultivated and improved with buildings and structures while the other relates to water, not water passing with the soil under it or confined within bounds but water in the open sea, changing with the rising and ebbing of the tide; it gave no right to the land under the water and no right to place any structure or improvement thereon, not even to anchor a house-boat, but a privilege to take fish from this area of water, if caught while there, a mere theoretical species of property at best.

If the "private property" possessed by the konohiki in the fishery was only the right given by the statute then it follows that when the statute was repealed there was no further claim of "private property" in the fishery, because that which gave the right or "private property" was no longer in existence. In this view and, we take it to be the correct view, the plaintiffs could acquire no vested right in the fishery. While the statutes were in force plaintiffs private property in the fishery was protected but when they were repealed there was no property in the *res.* These statutes were general laws. "Citizens have no vested rights in the existing general laws of the State which can preclude their amendment or repeal, and there is no implied promise on the part of the State to protect its citizens against incidental injury occasioned by change in the law." Cooley, Const. Lim., p. 343.

Again the same author says:

"In organized society every man holds all he possesses and looks forward to all he hopes for, through the aid and under the protection of the laws; but as changes of circumstances and of public opinion, as well as other reasons affecting the public policy, are all the while calling for changes in the laws, and as these changes must influence more or less the value and sta-

bility of private possessions, and strengthen or destroy well founded hopes, and as the power to make very many of them could not be disputed without denying the right of the political community to prosper and advance, it is obvious that many rights, privileges, and exemptions which usually pertain to ownership under a particular state of the law, and many reasonable expectations, cannot be regarded as vested rights in any legal sense." Cooley, p. 437.  *  *  *

"All vested rights are held subject to the laws for the enforcement of public duties and private contracts, and for the punishment of wrongs; and if they became divested through the operation of those laws, it is only by way of enforcing the obligations of justice and good order." *Id.* p. 438.

This view is in perfect harmony with the contemporaneous construction placed on these statutes in the leading case on the subject in this court, *Haalelea v. Montgomery*, 2 Haw. 62. In that case Mr. Justice Robertson said that the landlord "could have transferred the fishery, or her right therein, only by an express grant, *eo nomine*. Had she made a deed of the whole Ahupuaa, by metes and bounds, not including the fishery, nor expressly naming it in the conveyance, it is doubtful if either the fishery or her rights therein would have passed to the grantee." p. 70.

*     *     *     *     *     *     *     *

And again, "If any person who has acquired a kuleana on the Ahupuaa of Honouliuli should sell and convey his land, or even a part of it to another, a common right of piscary would pass to the grantee as an appurtenance to the land. In that case it would not be necessary, we apprehend, to mention the right of piscary in the conveyance, it would pass as an incident. Here, we think, is the great distinction between the rights of the konohiki and those of the tenants or occupants, for while the former holds the fishery as his private property the latter has only a right of piscary therein as an incident of his tenancy." *Id.* p. 71. Here it is declared that the konohiki's or landlord's rights in the fishery are private property and as such could not pass as an appurtenance to the land; that in order to convey it specific words of grant must be used in the conveyance for that purpose.

This decision was rendered in 1858, one year before the adoption of the Civil Code and its correctness, so far as we are advised, is now questioned for the first time. It is contended that this part of the decision is mere *dicta* and was not involved in a decision of the issues in that case. Even if this be true it does not appear how that fact would weaken the declaration as a correct interpretation of the theory of the law on which fishery rights in these islands are based. The decision was by Mr. Justice Robertson, whom the late Chief Justice Judd declared to be "our best authority" on early Hawaiian tradition, history and jurisprudence. It appears to have been accepted by the bench and bar of the islands as a correct declaration of law of the question for most half a century and no sufficient reason has been advanced to warrant us in questioning its correctness at this time.

This construction of the statute is further supported by the fact that the Land Commission although given authority to award "rights of piscary" by the statute creating it, (Statute Laws, vols. I and II, Sec. 7, p. 109), refused to award fisheries either as "rights or territory," except in a very few instances, leaving the parties to their rights under the general statutes." *Akeni v. Wong Ka Mau,* 5 Haw. 91. It is also confirmed by the language found in the first section of the Act of May 24, 1851, passed to protect the people in certain fishing grounds forbidding anyone who had acquired government land from exercising exclusive rights "over any fishing ground *not included in his title,* although adjacent to said lands." This inhibition was carried forward into the Civil Code of 1859 as Sec. 393, and into the Penal Laws of 1897 as Sec. 1458.

We do not understand that any of the adjudicated cases in this jurisdiction are opposed to this theory.

It was held that the konohiki or landlord had no power to alienate a single right given by law to the tenant in a sea fishery. *Oni v. Meek,* 2 Haw. 87.

Also that although the Land Commission heard evidence relative to the boundaries of the fisheries claimed by the konohiki

and refused to award the fishery either as a right or territory and although the konohiki of the adjoining land was present at the hearing still he was not estopped from disputing the boundary of the sea fishery claimed to be shown by such evidence. *Akeni v. Wong Ka Mau*, 5 Haw. 91.

While in *Shipman v. Nawahi*, 5 Haw. 571, the fishery is spoken of as "adjoining and appurtenant to plaintiff's land called Waiakea," the action was for damages for trespass upon the fishery. Judgment was for the plaintiff in the Court below, but on appeal it appeared that the defendant had a kuleana in the land of Waiakea hence a right to fish and a new trial was ordered.

The case of *Judd v. Kuanalewa*, 6 Haw. 329, was an action of ejectment by one landlord against another for possession of a fishery. It was found that there had been a division of the fishery by the parties and judgment was rendered accordingly.

*Hatton v. Piopio*, 6 Haw. 334, was an action against a tenant for unlawfully catching and selling fish, it was held that "under our fishing laws every resident on a land has the right to fish in the sea appurtenant to the land and to sell the fish caught by him."

*Shipman v. Com'rs. of Crown Lands*, 6 Haw. 351, was a suit in equity by the plaintiff's lessees of a sea fishery seeking an injunction to restrain the defendant from trespassing and fishing. It was held that no irreparable damage was shown and that there was an adequate remedy at law both by an action of damages and also under the statute by criminal proceedings. Injunction refused.

These we understand to be the principal decisions of this court construing the fishery statutes. While in some of them the fishery is spoken of as being "appurtenant to the land" and as "an appurtenant of the land" still in no one of them does the court in the slightest degree detract from the force of the law announced in *Haalelea v. Montgomery* or attempt to overrule the law there declared that a sea fishery could not pass as an appurtenance to the land. As a matter of fact the fishing

rights were appurtenant to the land so long as the statutes were in force but when the statutes were repealed these appurtenances were such no longer.

"Fish in the open sea are animals *ferae naturae*, and go and come at will unrestrained." (*Hatton v. Piopio*, 6 Haw. 337) But when taken fish were private property and entitled to the protection of the law. It was entirely proper for the legislature to prescribe penalties for violation of the fishing statute and for the courts to entertain civil actions for damages for trespassing against the rights given by statute.

In the second case the claim of grant is based upon a clause in the patent for the land of Moanalua. It appears in the patent after the operating words of grant and the description of the land conveyed that there is a recital relative to the fishery as follows, to-wit: "There is also attached to this land a fishing right in the adjoining sea, which is bounded as follows." Then a description of the fishery claimed in the petition is set out by metes and bounds. The habendum clause of the Patent reads in part "To have and to hold the above granted land; in fee simple, unto the said Lot Kamehameha," etc. The Patent was a grant of land. The operating words of grant are not enlarged by the habendum clause. The fishing right was not land or a necessary part thereof. The word "attached" cannot be construed as a word of grant or as showing an intention to convey. It does not appear from the Patent that it was the intention of the grantor to convey the fishery. The recital relative to the fishery may have been inserted for the purpose of making plain the boundaries of the fishery adjoining the land and in which the statute gave the landlord special privileges. The plaintiffs, it seems, took this view of the matter as the evidence shows that he exercised the right in the fishery under the statute.

Under the common law the right of fishing in the open sea like that of navigation was a public right. The grant of an exclusive right to a sea fishery cannot be presumed. Every presumption is against the grant and in favor of the public. Every ambiguity or doubt in the instrument by which the right is

·claimed to be granted will be construed most strongly against the grantee.

*Rapid Transit Co. v. Tram. Co.,* 13 Haw. 363, 371; *Charles River Bridge v. Warren Bridge,* 11 Pet. 420; *Fertilizer Co. v. Hyde Park,* 97 U. S. 659; *Newton v. Commissioners,* 100 U. S. 548. *Shivley v. Bowlby,* 152 U. S. 1.

Applying this well established rule of construction to the facts, we are bound to hold that the patent to the land of Moanalua did not grant the sea fishery adjoining.

Exceptions are overruled.

*Hatch & Silliman* for the plaintiff.

*Cecil Brown* and *Magoon & Peters* on brief.

*Robertson & Wilder* for defendant.