**Electronically Filed
Supreme Court
SCAP-19-0000501
11-AUG-2022
07:54 AM
Dkt. 33 MO**

SCAP-19-0000501

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

MĀLAMA CHUN, Plaintiff-Appellant,

vs.

BOARD OF LAND AND NATURAL RESOURCES, DEPARTMENT OF LAND AND
NATURAL RESOURCES, STATE OF HAWAI'I, and HAWAI'I LONGLINE
ASSOCIATION, Defendants-Appellees.

APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CAAP-19-0000501; CASE NO. 2CC191000089)

MEMORANDUM OPINION
(By: Recktenwald, C.J., Nakayama, McKenna, and Wilson, JJ., and
Circuit Judge Tonaki, in place of Pollack, J.[1], recused)

## I.    INTRODUCTION

In a petition for a declaratory order (Petition) filed

with the Board of Land and Natural Resources (BLNR), Plaintiff-

Appellant Mālama Chun requested the BLNR hold that the

Department of Land and Natural Resources (DLNR) lacks authority

to "issue commercial [marine] licenses to persons not lawfully

_____

[1]    Associate Justice Richard W. Pollack retired on June 30, 2020.

admitted to the United States," including foreign nonimmigrant crewmembers on longline fishing vessels.  Specifically, Chun argued that Hawai'i Revised Statutes (HRS) § 189-5 (2011) prohibits the DLNR from issuing commercial marine licenses (CMLs) to persons not lawfully admitted to the United States.

The limitation in HRS § 189-5 applies only to persons "engage[d] in taking marine life for commercial purposes <u>in the waters of the State</u>."  HRS § 189-5 (emphasis added).  The BLNR denied Chun's Petition, concluding, among other things, that longline fishing vessels do not fish within state waters.  The Circuit Court of the Second Circuit (circuit court) affirmed. We granted Chun's application for transfer and conclude that the DLNR is not prohibited from issuing CMLs to foreign nonimmigrant crewmembers on longline fishing vessels who fish for highly migratory species outside of state waters.  Because the longline fishing vessels at issue here do not fish within state waters, we affirm the circuit court's order denying Chun's Petition.

## II.  BACKGROUND

Hawai'i's longline fishing industry consists of approximately 140 boats that dock in Honolulu Harbor.  These boats fish exclusively for "highly migratory species," defined by the Magnuson-Stevens Conservation and Management Act (Magnuson-Stevens Act) as "tuna species, marlin (Tetrapturus

spp. and Makaira spp.), oceanic sharks, sailfishes (Istiophorus spp.), and swordfish (Xiphias gladius)."  16 U.S.C. § 1802.

Federal regulations prohibit longline boats from fishing in specific areas around Hawai'i.  For example, longline boats cannot fish closer than approximately fifty miles to the north and east of the main Hawaiian Islands, and one hundred miles to the south and west of the main Hawaiian Islands.  Longline fishing is also prohibited in the Exclusive Economic Zone[2] (EEZ) around the Northwestern Hawaiian Islands, which extends two hundred nautical miles seaward.

## A.    BLNR Proceedings

Chun filed his Petition on April 12, 2017, requesting the BLNR to issue a "declaratory ruling regarding the authority of the [DLNR] to issue [CMLs[3]] to persons not lawfully admitted to the United States."  Chun contended he was an interested person under HRS § 91-8 (2012)[4] and thus permitted to "petition [the BLNR] for a declaratory order as to the applicability of any statutory provision."  HRS § 91-8.

---

[2]    An Exclusive Economic Zone (EEZ) is a region of the ocean where a coastal country claims exclusive rights to natural resources.

[3]    HRS § 187A-1 (2011) defines CMLs as "a license issued to take marine life within or outside the State for commercial purpose."

[4]    HRS § 91-8 (2012) states in relevant part: "Any interested person may petition an agency for a declaratory order as to the applicability of any statutory provision or of any rule or order of the agency."

Chun also argued that HRS §§ 189-2 (2011)[5] and 189-5 "prohibit the [DLNR] from issuing [CMLs] to any person who has not been lawfully admitted to the United States" including foreign nonimmigrant crewmembers on longline fishing vessels. Additionally, Chun contended that issuing CMLs to foreign crewmembers who are subject to "unfair and illegal labor practices" contradicts "the Kānāwai Māmalahoe, or law of the Splintered Paddle, which [was] adopted at [a]rticle IX, [s]ection 10 of the Hawai'i State Constitution."[6]

The BLNR denied Chun's Petition on July 14, 2017, concluding: (1) Chun is not an "interested person" entitled to a declaratory order under HRS § 91-8; (2) the issue of whether commercial fishing companies' employment of non-citizen fishers violates article IX, section 10 of the Hawai'i Constitution is outside the jurisdiction of the BLNR; and (3) labor practices are also outside the jurisdiction of the BLNR. However, the

---

[5]     HRS § 189-2(a) (2011) states, in relevant part: "No person shall take marine life for commercial purposes whether the marine life is caught or taken within or outside of the State, without first obtaining a commercial marine license as provided in this section."

[6]     Article IX, section 10 of the Hawai'i Constitution states:

The law of the splintered paddle, [kānāwai māmalahoe], decreed by Kamehameha I--Let every elderly person, woman and child lie by the roadside in safety--shall be a unique and living symbol of the State's concern for public safety.

The State shall have the power to provide for the safety of the people from crimes against persons and property.

circuit court[7] reversed, concluding that "Chun made a prima facie showing that he is an interested person under HRS § 91-8" and is thus "entitled to a hearing" if the BLNR contested his prima facie showing that he is an interested person.

On remand, Hawai'i Longline Association (HLA) intervened and filed a brief in opposition to Chun's Petition contending, among other things, that "[t]he areas in which the Hawai'i longline fishery operates are regulated by [f]ederal law," and "[f]ederal law explicitly allows the use of foreign crews on U.S. vessels fishing for highly migratory species . . . ." Moreover, HLA argued that the plain language of HRS § 189-5 limits fishing for commercial purposes in the waters of the state and has no application to commercial fishing that takes place exclusively outside of state waters. HLA contended that federal law "expressly permits" foreign nonimmigrant crewmembers to fish for highly migratory species, and the Magnuson-Stevens Act, 16 U.S.C. §§ 1801–1891d, reserves "exclusive fishery management authority over all fish" in the EEZ to the federal government.[8] HLA argued that "because the Hawai'i-based

_____

[7]    The Honorable Joseph E. Cardoza presided.

[8]    Specifically, 16 U.S.C. § 1811(a) states that "[e]xcept as provided in section 1812 of this title, the United States claims, and will exercise in the manner provided for in this chapter, sovereign rights and exclusive fishery management authority over all fish, and all Continental

(continued . . .)

longline fishing fleet fishes only in the EEZ and beyond, and not in state waters, [f]ederal law applies, and precludes state regulation that is inconsistent with [f]ederal fishing laws and regulations."

The BLNR issued its findings of fact, conclusions of law, and order denying Chun's Petition on February 27, 2019. The BLNR first noted that Chun's Petition "ultimately turns on the meaning of two phrases: 'in the waters of the State[,]' and 'lawfully admitted.'"[9]  In its findings of fact, the BLNR found, as relevant here:

> 5.  There is no evidence in the record that the presence of the crewmembers in Honolulu Harbor . . . is illegal in the eyes of the federal government . . . .

---

(. . . continued)
Shelf fishery resources, within the exclusive economic zone."  (Emphasis added.)

[9]     The BLNR held that foreign crewmembers of longline fishing vessels were "lawfully admitted" for the purposes of HRS § 189-5.  The BLNR acknowledged that "lawfully admitted" does not always mean "lawfully admitted to permanent residency[,]" citing Takahashi v. Fish & Game Comm'n, 334 U.S. 410 (1948) and Dandamudi v. Tisch, 686 F.3d 66 (2d Cir. 2012) as examples of cases where foreign individuals were lawfully present in the United States without being "lawfully admitted to permanent residency."
The BLNR also found that the legislature merely intended to differentiate "[a]liens not admitted to the United States, as distinguished from aliens who are legally in the United States[.]"  (Emphasis omitted.)  Further, the BLNR noted that various federal statutes and regulations establish the procedure for foreign crewmembers to obtain landing privileges; however, nothing in these statutes or regulations suggests that foreign crewmembers are illegally present if their landing privileges are not granted and they remain detained on the vessel.
Despite the BLNR's conclusions of law on this issue, we decline to determine whether foreign crewmembers are "legally admitted" for purposes of HRS § 189-5 as we hold that longline fishing vessels do not in fact fish within the state marine waters.  See discussion infra Section IV(B).

> 6.    The longline vessels based in Honolulu Harbor fish exclusively for "highly migratory species" as that term is defined in the Magnuson-Stevens Act . . . .
>
> 7.    Because of [f]ederal regulations, the longline boats do not fish closer than fifty miles to the north and east of the main Hawaiian Islands, and one hundred miles to the south and west of the main Hawaiian Islands.
>
> . . . .
>
> 9.    Most fish caught by the longliners are taken beyond the Hawai'i EEZ, from the "high seas" or international waters.

(Citations omitted.)

The BLNR explained that "[e]ven if [foreign nonimmigrant] crewmembers . . . were not 'lawfully admitted[,]' HRS § 189-5 does not prohibit them from receiving a CML."  It additionally noted that the statute only prohibits foreign nonimmigrant crewmembers from taking marine life within state waters and "does not prohibit [foreign nonimmigrant crewmembers] from taking marine life outside the waters of the State and bringing it into the State for sale."  The BLNR concluded, as relevant here:

> 3.    [HRS § 189-5] limits the prohibition on taking marine life for commercial purposes by [foreign nonimmigrant crewmembers] to marine life taken "in the waters of the State."
>
> . . . .
>
> 5.    This language, combined with HRS § 189-2(a) regarding the requirement of getting a CML, means that in addition to someone who actually takes marine life for commercial purposes, someone who takes marine life outside the waters of the State, but brings it into the State for sale, must get a CML.  It does not, however, change the fact that the HRS § 189-5 ban only refers to marine life actually caught in the waters of the State.

. . . .

7.  HRS § 189-5 does not prohibit non-admitted aliens from working on boats that take marine life outside the waters of the State and bring it into the State for sale.

8.  Petitioner makes an argument based on a provision in HRS § 189-2(a) that a CML is required if one takes marine life for commercial purposes "whether the marine life is caught or taken within or outside of the State[.]" The short answer to this is that HRS § 189-5 prohibits non-admitted alien commercial fishing only "in the waters of the State."

9.  Petitioner may have been led astray, however, by inartful drafting of HRS § 189-2(a) . . . .

10.  Read literally, HRS § 189-2(a) asserts that anyone taking marine life for commercial purposes anywhere on Earth must get a Hawaiʻi CML, because everywhere on Earth is either "within or outside of the State." This is an absurd reading. Hawaiʻi cannot make people taking marine life in the Atlantic Ocean get a CML, absent some nexus to Hawaiʻi[.]

. . . .

13.  In any case, [ ] whatever the territorial reach of HRS § 189-2(a) may be, HRS § 189-5 applies only "in the waters of the State."

The BLNR next concluded that the longline fishing vessels do not fish within the waters of the state. The BLNR explained that when HRS § 189-5 was first enacted by Act 211, SLH 1949, the words "waters of the Territory of Hawaiʻi" meant a band around the islands extending three nautical miles from the shore.[10]  After statehood, HRS § 189-5 was amended so that

---

[10]  To support this proposition, the BLNR cited The King v. Parish, 1 Haw. 36, 58 (Haw. Kingdom 1849); Carter v. Territory of Haw., 14 Haw. 465, 468-69 (Haw. Terr. 1902); In re Bishop, 35 Haw. 608, 643-44 (Haw. Terr. 1940); Civ. Aeronautics Bd. v. Island Airlines, Inc., 235 F. Supp. 990, 1007 (D. Haw. 1964), aff'd, 352 F.2d 735 (9th Cir. 1965); and Dettling v. United States, 983 F. Supp. 2d 1184, 1201 (D. Haw. 2013).

(continued . . .)

"waters of the Territory" became "waters of the State." The BLNR then "consider[ed] whether 'waters of the State' now means something different." The BLNR recognized that its declaratory order could not be a definitive determination of Hawai'i's current oceanic boundaries. However, it held that "for the purposes of this declaratory order it is enough to demonstrate that the longline fishing boats do not fish within Hawai'i's oceanic boundaries, even given the most expansive possible interpretation of those boundaries." The BLNR then considered several alternative interpretations of "waters of the State" and concluded that longline fishing vessels do not fish within the ambit of any interpretation.

In relevant part, the BLNR considered whether "waters of the State" includes archipelagic waters. The BLNR concluded that:

> 31. The 1978 Constitutional Convention proposed an amendment to [article XV, §1 of the state constitution] to add "and archipelagic" to the first sentence of this provision, which now reads "The State of Hawai'i shall consist of all the islands, together with their appurtenant reefs and territorial and archipelagic waters[.]"
>
> 32. The Proceedings of the 1978 Constitutional Convention do not fully explain what was meant by "archipelagic waters" . . . .

---

(. . . continued)

The BLNR noted that it is not clear whether the "1949 Legislature considered the channels to be within the boundaries of the Territory." However, the BLNR held that the inclusion or exclusion of the channels "does not matter" because "longline boats do not fish in the channels."

. . . .

> 34.  Art. 46-47 of the . . . United Nations Convention on the Law of the Sea (1982) ("UNCLOS") define circumstances under which an island nation (not an American state) may claim "archipelagic waters", and the extent of such waters.  Essentially, the boundary lines are drawn from points on the outer islands, but cannot be more than 125 nautical miles long.  Drawing such lines from various points on the main Hawaiian Islands does not enclose any areas more than fifty miles to the north or east of the islands, or more than one hundred miles to the west or south.  Thus, even assuming Hawai'i's oceanic boundaries now encompass "archipelagic waters" as so defined in international law . . . these longline boats do not fish within them.

(First emphasis in original.)

The BLNR also interpreted "waters of the State" to mean the "state marine waters," which was defined in 1990 Haw. Sess. Laws Act 126, §1 at 232 to include the "territorial sea."[11] Regarding Act 126, the BLNR concluded that:

> 36.  Hawai'i's statutes now apparently claim a twelve nautical mile wide territorial sea.  Act 126, SLH 1990, amended several sections of the Hawai'i Revised Statutes by adding a definition of "state marine waters", including one section currently codified as HRS §189-1.5:
>
>> State marine waters.  As used in this chapter, state marine waters shall be defined as extending from the upper reaches of the wash of the waves on shore seaward to the limit of the State's police power and management authority, including the U.S. territorial sea, notwithstanding any law to the contrary.

---

[11]     The BLNR defined "territorial sea" or "marginal sea" as the oceanic boundaries of a state or nation, where the state or nation exercises sovereignty, except for certain rights of passage under international law. Presidential Proclamation 5928, dated December 27, 1988, extended the "territorial sea" from the former three-mile area to then encompass twelve nautical miles from the "baseline."

37.  According to Conf. Com. Rep. 6 on H.B. 2233, which became Act 126:

>     The purpose of this bill is to define the boundaries of the state marine waters as extending twelve nautical miles seaward from the upper reaches of the wash of the waves on shore and the archipelagic waters.  It also defines the territorial sea as the waters and seabed extending seaward to twelve nautical miles from the baseline as determined in accordance with international law and as established by Presidential Proclamation 5928, dated December 27, 1988.

(Emphasis added.)  The BLNR ultimately held that "longline boats do not fish in this twelve-mile belt."  (Emphasis added.)

The BLNR also clarified that article XI, section 11 of the Hawai'i Constitution does not determine, claim, or amend Hawai'i's boundaries.[12]

---

[12]  Article XI, section 11 of the Hawai'i Constitution provides that:

> The State of Hawai'i asserts and reserves its rights and interest in its exclusive economic zone for the purpose of exploring, exploiting, conserving and managing natural resources, both living and nonliving, of the seabed and subsoil, and super adjacent waters.

Article XI, section 11 merely asserts the State's rights to regulate and exploit within the EEZ. The BLNR also identified the State's reserved authority within and outside "the territorial sea":

> 41.  When the Legislature dealt with the controversies over longline fishing near the Hawaiian Islands, it banned it in "the territorial sea."  HRS §189-2.5(b).  Outside the territorial sea, it asserted only that Hawai'i could jointly enforce, with the federal government, regulations established under the federal regulatory system referred to above.  HRS §189-2.5(c); HRS §189-3.5.

The BLNR then rejected Chun's argument that "issuing CML to the alien crewmembers would authorize the crewmembers to fish illegally." The BLNR explained that:

> 43. HRS §189-5 does apply within Hawaiʻi's territorial boundaries. The CML would not authorize the holder, if he or she were an alien "not lawfully admitted," to fish within Hawaiʻi's territorial seas, which are "waters of the State." The fact that a person holds a CML does not authorize the person to ignore other laws regarding the taking of marine life. . . . The fact that a CML holder may possibly violate state laws in the future does not justify denying them a CML.

> 44. That these alien crewmembers—even if not "lawfully admitted" as the term is used in HRS §189-5—can lawfully fish somewhere without violating that statute, for example, on the high seas, is enough to deny this Petition, because it asks the Board to categorically deny that they can be issued CML's [sic]. Because they can fish on the high seas and/or the EEZ without violating Hawaiʻi law, it makes sense to issue them a CML when they bring the catch to port. This is not prohibited by HRS §189-5 or any other law.

> 45. [Chun] conceded that HRS §189-5 was "unenforceable" in the EEZ.

## B.  Circuit Court Proceedings

Chun appealed to the circuit court, and filed a motion for summary judgment. On July 1, 2019, the circuit court filed an order affirming the BLNR's decision and denied Chun's motion for summary judgment. The circuit court ruled, inter alia, that "[HRS §] 189-2 applies in general to the issuance of [CMLs] and does not contain a limitation relative to the issuance of a license concerning being lawfully permitted to be in the United States." The circuit court additionally concluded:

> [HRS §] 189-5 makes it unlawful for any person who is not lawfully admitted to the United States to engage in the

12

taking of marine life for commercial purposes in the waters of the [S]tate of Hawai'i. And here, the fishermen in question are not engaged in the taking of marine life for commercial purposes in the waters of the State of Hawai'i.

And that specific provision here, in the Court's view respectfully, is controlling.

## C. Proceedings on Appeal

On appeal, Chun argues that the circuit court erred in affirming the BLNR's order that (1) foreign nonimmigrant crewmembers were "lawfully admitted" to the United States; (2) CMLs can be issued to persons not "lawfully admitted" to the United States; and (3) "a factual record of alien fishers holding commercial fishing licenses and conducting commercial fishing within state waters, was a required element of relief sought by the Petition."

The State's answering brief argues that the legislative history of HRS § 189-5 reveals the legislature's intent to ban "[a]liens not admitted to the United States" – as opposed to aliens who are legally in the United States – from commercial fishing in state waters. Therefore, foreign nonimmigrant crewmembers on longline fishing vessels are "lawfully admitted" to the United States. Moreover, the State contended that Chun does not dispute the fact that most longline vessels fish in waters beyond the EEZ.

HLA reiterates its arguments raised below in its answering brief.

## III. STANDARDS OF REVIEW

### A. Administrative Agency Decisions – Secondary Appeals

Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) [1993] to the agency's decision.

Flores v. Bd. of Land & Nat. Res., 143 Hawai'i 114, 120, 424 P.3d 469, 475 (2018) (alteration in original) (quoting Paul's Elec. Serv., Inc. v. Befitel, 104 Hawai'i 412, 416, 91 P.3d 494, 498 (2004)).

HRS § 91-14(g) (Supp. 2017) states:

Upon review of the record, the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority or jurisdiction of the agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"[U]nder HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions

14

regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6)." Flores, 143 Hawaiʻi at 121, 424 P.3d at 476 (alteration in original) (internal quotation marks omitted) (quoting Paul's Elec. Serv., Inc., 104 Hawaiʻi at 416, 91 P.3d at 498).

## B.    Statutory Interpretation

"Statutory interpretation is a question of law reviewable de novo." State v. Wheeler, 121 Hawaiʻi 383, 390, 219 P.3d 1170, 1177 (2009) (internal quotation marks omitted).

This court's construction of statutes is shaped by the following rules:

> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.
>
> When there is ambiguity in a statute, "the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." Moreover, the courts may resort to extrinsic aids in determining legislative intent, such as legislative history, or the reason and spirit of the law.

Id. (quoting Citizens Against Reckless Dev. v. Zoning Bd. of Appeals, 114 Hawaiʻi 184, 193–94, 159 P.3d 143, 152–53 (2007)).

15

## IV.  DISCUSSION

**A.   HRS § 189-5 Does Not Prohibit the DLNR From Issuing CMLs to Foreign Nonimmigrant Crewmembers on Longline Fishing Vessels Under HRS § 189-2**

This case requires us to consider the provisions of two statutes, which provide, in relevant part, as follows:

> No person shall take marine life for commercial purposes whether the marine life is caught or taken within or outside of the State, without first obtaining a commercial marine license as provided in this section.

HRS § 189-2(a).

> It is unlawful for any person who has not been lawfully admitted to the United States to engage in taking marine life for commercial purposes in the waters of the State.

HRS § 189-5.

Chun contends that the DLNR violates HRS § 189-5 by issuing CMLs under HRS § 189-2 to foreign nonimmigrant crewmembers on longline fishing vessels.  We disagree.  Rather, as the BLNR found, "HRS § 189-5 . . . prohibits non-admitted aliens from the commercial taking of marine life 'in the waters of the State.'  It does not prohibit them from taking marine life <u>outside</u> the waters of the State and bringing it into the State for sale."  **(**Emphasis in original.)

**1.   HRS § 189-2 permits the DLNR to issue CMLs to foreign nonimmigrant crewmembers on longline fishing vessels**

"[T]he fundamental starting point for statutory interpretation is the language of the statute itself."  <u>Wheeler</u>, 121 Hawai'i at 390, 219 P.3d at 1177 (quoting <u>Citizens Against</u>

16

Reckless Dev., 114 Hawai'i at 193-94, 159 P.3d at 152-53). HRS §
189-2(a) states, "No person shall take marine life for
commercial purposes whether the marine life is caught or taken
within or outside of the State, without first obtaining a [CML]
as provided in this section." (Emphasis added.) Our court has
long established that "where the statutory language is plain and
unambiguous, our sole duty is to give effect to its plain and
obvious meaning." Wheeler, 121 Hawai'i at 390, 219 P.3d at 1177
(citations omitted). However, "where a statute is susceptible
of two constructions, by one of which grave and doubtful
constitutional questions arise and by the other of which such
questions are avoided, our duty is to adopt the latter." In re
Doe, 96 Hawai'i 73, 81, 26 P.3d 562, 570 (2001) (quoting U.S. ex
rel Att'y Gen. v. Del. & Hudson Co., 213 U.S. 366, 408 (1909));
cf. Clark v. Martinez, 543 U.S. 371, 381 (2005).

Were we to adopt Chun's interpretation, HRS § 189-2
would require any person taking any marine life anywhere in the
world for commercial purposes to first obtain a CML from the
DLNR. A literal reading of the statute would thus result in an
absurdity; the legislature does not have the power to regulate

17

conduct that lacks a cognizable connection to the state.[13]
Therefore, we must construe the statute to require a CML only
when the taking of marine life has some nexus to the state.  See
State v. McKnight, 131 Hawai'i 379, 389, 319. P.3d 298, 308
(2013) ("Even where a statute appears unambiguous, the court may
deviate from a literal application of the language in order to
avoid absurdity and give effect to the legislature's intended
purpose." (citation omitted)).

The BLNR instead concluded that HRS § 189-2 requires
CMLs in two scenarios that give rise to a Hawai'i nexus: (1) when
taking marine life within state waters for commercial purposes,
and (2) when bringing marine life taken from outside state
waters for commercial purposes in the state.  This
interpretation avoids absurd and unintended results; we thus
conclude that the BLNR's interpretation of HRS § 189-2 to
require CMLs in the two aforementioned scenarios is correct.

---

[13]     Indeed, we note that such a construction would likely violate the
dormant commerce clause. See Healy v. Beer Inst., Inc., 491 U.S. 324, 336
(1989) ("[A] statute that directly controls commerce occurring wholly outside
the boundaries of a State exceeds the inherent limits of the enacting State's
authority and is invalid regardless of whether the statute's extraterritorial
reach was intended by the legislature."); State v. Alangcas, 134 Hawai'i 515,
536, 345 P.3d 181, 202 (2015) ("The doctrine of the dormant commerce clause
is a result implied from the federal government's exclusive authority to
control interstate commerce and may require a court to invalidate a state law
that interferes with that authority." (footnote and citation omitted)); but
see Oral Argument at 13:03, Chun v. Bd. of Land & Nat. Res., -- Hawai'i --, --
P.3d --, 2022 WL --, (August 11, 2022) (mem.),
http://oaoa.hawaii.gov/jud/oa/20/SCOA_091820_SCAP_19_501.mp3.

Cf. State v. Park, 55 Haw. 610, 614, 525 P.2d 586, 589-90 (1974) ("It is well settled and established in this jurisdiction that courts are required to construe and interpret a statute where it is ambiguous, or, absent such ambiguity, where the literal application of the statute causes an absurd or unjust result[.]").

> **2.   HRS § 189-5 prohibits the issuance of CMLs to persons not "lawfully admitted" to the United States for purposes of taking fishing only _within_ state waters**

In turn, HRS § 189-5 provides, "It is unlawful for any person who has not been lawfully admitted to the United States to engage in taking marine life for commercial purposes <u>in the waters of the State</u>."  (Emphasis added.)  Unlike HRS § 189-2, this statute is unambiguous.  See, e.g., Park, 55 Haw. at 614, 525 P.2d at 590 ("[W]here there is no ambiguity in the language of a statute, and the literal application of the language would not produce an absurd or unjust result . . . there is no room for judicial construction and interpretation, and the statute must be given effect according to its plain and obvious meaning.").  The statute precludes persons not lawfully admitted to the United States from taking marine life <u>within</u> state waters for commercial purposes.  Moreover, the statute makes no mention of the taking of marine life <u>outside</u> of state waters.

If the legislature intended HRS § 189-5 to prohibit those not lawfully admitted to the United States from taking marine life outside of the state for commercial purposes within the state, we presume it would have said so. See State v. Demello, 136 Hawai'i 193, 195, 361 P.3d 420, 422 (2015) ("[T]his court must presume that the legislature meant what it said and is further barred from rejecting otherwise unambiguous statutory language." (citation omitted)); cf. State v. Haugen, 104 Hawai'i 71, 76, 85 P.3d 178, 183 (2004). In contrast, the legislature provided in HRS §189-2 that a CML is required before any person "take[s] marine life for commercial purposes whether the marine life is caught or taken within or outside of the State." (Emphasis added). The express inclusion of "outside of the State" in HRS § 189-2 suggests that the legislature "intentionally and purposely" excluded similar language from HRS § 189-5 that would prohibit those not lawfully admitted to the United States from taking marine life outside of the state for commercial purposes within the state. See In re Water Use Permit Applications, 94 Hawai'i 97, 151, 9 P.3d 409, 463 (2000) (quoting Gozlon–Peretz v. United States, 498 U.S. 395, 404 (1991)) ("[W]here [the legislature] includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislature]

acts intentionally and purposely in the disparate inclusion or exclusion." (Brackets in original.))

Chun argues that the "DLNR's issuance of a [CML] to non-citizen commercial fishers pursuant to HRS § 189-2, without qualification or limit to the use of those licenses," violates HRS § 189-5. He further argues that issuing such a CML "provide[s] no restrictions on the license-holder and leaves it entirely to the licensee to determine what restrictions are placed upon the license by law." In support of this contention, Chun cites Alaloa v. Plan. Comm'n of Maui Cnty., 68 Haw. 135, 705 P.2d 1042 (1985), and argues that this court has rejected the "self-regulation" of licenses.

Chun's reliance on Alaloa is misplaced. In Alaloa, this court rejected the Maui Planning Commission's grant of a conditional permit to the developer of a large condominium construction project in a special management area that was governed by the Coastal Zone Management Act (CZMA). Specifically, the permit was "conditioned upon retention of a qualified archaeologist to conduct a further survey and excavation of the area . . . [and] to determine the significance of [the] various archaeological sites" located near the development. Alaloa, 68 Haw. at 136-37, 705 P.2d at 1044. This court, concluding that the commission erred in granting the

conditional permit, explained that "the CZMA mandates that [findings regarding the archaeological significance and preservation of those sites] must first be made before a [permit] can be issued." Id. at 137, 705 P.2d at 1044 (emphases in original). By granting the permit, the commission created "self-serving conditions" wherein the developer was allowed to determine whether it "complie[d] with the policies and objectives of the CZMA regarding historical and archaeological significance." Id. We thus concluded that the commission violated its duties under the CZMA to ensure that "the proposed development project[] [was] consistent with the[] [state's] policies and objectives" under the CZMA. Id. at 136, 705 P.2d at 1044.

The Alaloa holding is distinguishable. The DLNR does not violate HRS § 189-5 by issuing CMLs under HRS § 189-2 to foreign nonimmigrant crewmembers on longline fishing vessels, nor does it consign any of its duties under HRS § 189-5 to the licensee. Certainly, issuing a CML to a foreign nonimmigrant crewmember on a longline fishing vessel for marine life caught outside of state waters is permissible under HRS § 189-2 and additionally complies with HRS § 189-5. These foreign crewmembers are not left "to determine what restrictions are placed upon" them as Chun contends; rather, HRS § 189-5

22

expressly prohibits them from "engag[ing] in taking marine life for commercial purposes in the waters of the State." Alaloa is thus inapposite.

### 3. HRS §§ 189-2 and 189-5 are not in conflict with one another

That HRS § 189-2 makes no reference to HRS § 189-5 is immaterial. Both statutes relate to the issuance of CMLs, and "[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other." Richardson v. City & Cnty. of Honolulu, 76 Hawai'i 46, 55, 868 P.2d 1193, 1202 (1994) (alteration in original) (quoting HRS § 1-16 (1985)). Moreover, "where the statutes simply overlap in their application, effect will be given to both if possible, as repeal by implication is disfavored." Id. (quoting Mahiai v. Suwa, 69 Haw. 349, 356-57, 742 P.2d 359, 366 (1987)). HRS § 189-2 mandates who must have a CML, whereas HRS § 189-5 limits where persons not lawfully admitted to the United States may engage in the taking of marine life for commercial purposes. The statutes are not in conflict with one another as each serves separate and distinct purposes regarding the same subject matter. See Richardson, 76 Hawai'i at 55, 868 P.2d at 1202 (holding that HRS §§ 46-1.5(6) (Supp. 1992), 46-61 (1985), 46-62 (1985), and 101-2 (1985) do not conflict but rather complement each other because, read in pari materia, HRS §§ 46-1.5(6) and 101-2 provide

23

counties with the power of eminent domain, HRS § 46-61 establishes the public uses for which the counties may use the power, and HRS § 46-62 establishes the procedures counties must use "in exercising the power").

Indeed, a person not lawfully admitted to the United States may receive a CML pursuant to HRS § 189-2 and would not violate HRS § 189-5 so long as that individual does not take marine life within state waters. Construing the statutes in pari materia: (1) under HRS § 189-2, any person who intends to take marine life from waters within or outside the state for commercial purposes within the state must first obtain a CML; (2) as HRS § 189-2 makes no mention of citizenship status, individuals not lawfully admitted to the United States are permitted to received CMLs pursuant to HRS § 189-2; (3) under HRS § 189-5, individuals not lawfully admitted to the United States may not engage in taking marine life for commercial purposes in the waters of the state; and (4) even if individuals not lawfully admitted to the United States have valid CMLs pursuant to HRS § 189-2, they are still prohibited by HRS § 189-5 from "taking marine life for commercial purposes in the waters of the State."

**B.    Longline Fishing Vessels Do Not Take Marine Life Within the "Waters of the State" or Hawai'i's Territorial Sea**

Chun further contends that the "waters of the State" – under HRS § 189-5 and for purposes of the state's regulatory authority – extend 200 miles from Hawai'i's shores, to include the area of the federal EEZ.[14]  Thus, Chun argues that HRS § 189-5 prohibits the foreign longline crewmembers at issue from "taking marine life for commercial purposes" within 200 miles off Hawai'i's shores.  Chun also argues that the state's regulatory authority extends no further than the same 200-mile boundary, meaning that the privileges granted by a CML can only be exercised within the 200-mile boundary.  Taken together, Chun contends that because the foreign longline crewmembers <u>cannot</u> fish within the 200-mile boundary, but the privileges of a CML can only be exercised <u>within</u> the 200-mile boundary, there is no way for a foreign longline crewmember to lawfully exercise the privileges of a CML.[15]

---

[14]     Proclamation No. 5030, 48 Fed. Reg. 10605 (Mar. 10, 1983) proclaimed that the EEZ "extends to a distance 200 nautical miles from the baseline from which the breadth of the territorial sea is measured."

[15]     At oral argument, counsel for Chun argued:

> The issue basically boils down to the State cannot issue licenses to individuals that can basically never exercise the privileges granted under that license. . . . Our position is that there is no place within the state's jurisdiction under the statute that these individuals can take [CMLs]. . . . In this instance, there's no . . . where
> (continued . . .)

25

We reject Chun's premise that under the relevant statutory framework, "waters of the State" extend 200 miles from Hawai'i's shoreline to include the entire area of the federal EEZ. Further, we conclude that the BLNR's findings that the longline vessels at issue in this case do not fish within the "waters of the State," the state marine waters, or the channels between the islands, is not clearly erroneous.

1. **The state's statutory authority to regulate longline fishing extends from Hawai'i's shores to the territorial sea and the archipelagic waters**

Chun's arguments on appeal focus solely on the intersection of HRS §§ 189-2 and 189-5. HRS §§ 189-2 and 189-5 are general laws in that they address fishing generally and do not explicitly address longline fishing. As HLA notes, HRS §§ 189-2 and 189-5 are not the only statutes applicable to the longline vessels at issue in this case. HRS § 189-2.5 (2011) provides specific guidance on longline fishing:

> (b) It is unlawful to engage in longline fishing or to sell or offer for sale, any marine life taken with longline fishing gear within the boundaries of the State's territorial sea.
>
> . . . .

---

(. . . continued)
an individual with this license anywhere within the state's jurisdiction or management . . . can legally fish.

Oral Argument at 7:50, Chun v. Bd. of Land & Nat. Res., -- Hawai'i --, -- P.3d --, 2022 WL -- (August 11, 2022) (mem.), http://oaoa.hawaii.gov/jud/oa/20/SCOA_091820_ SCAP_19_501.mp3.

> (d) The State shall have authority to enforce this section and the rules adopted by the Western Pacific Regional Fishery Management Council through the National Oceanic and Atmospheric Administration and incorporated by reference into state law within:

> > (1) The State's marine waters as defined in section 189-1.5[.]

It is a well-accepted "canon of construction that statutes that are in pari materia may be construed together," State v. Kamana'o, 118 Hawai'i 210, 218, 188 P.3d 724, 732 (2008), so that "[w]hat is clear in one statute may be called upon in aid to explain what is doubtful in another," HRS § 1-16 (2009). Therefore, because HRS § 189-2.5 is a prohibition on longline fishing, it is relevant to this court's analysis.

To summarize these pertinent parts of HRS § 189-2.5: (1) longline fishing is prohibited within the state's territorial sea, and (2) the state's authority to regulate longline fishing extends to the boundaries of the state's marine waters.

The state's marine waters are defined by HRS § 189-1.5 (2011) as "extending from the upper reaches of the wash of the waves on shore seaward to the limit of the State's police power and management authority, including the United States territorial sea, notwithstanding any law to the contrary." The legislative history of HRS § 189-1.5 states:

> The purpose of this bill is to define the boundaries of the state marine waters as extending twelve nautical miles seaward from the upper reaches of the wash of the waves on

> shore and the archipelagic waters. It also defines the territorial sea as the waters and seabed extending seaward to <u>twelve nautical miles</u> from the baseline of the United States as determined in accordance with international law and as established by Presidential Proclamation 5928, dated December 27, 1988.[16]

Conf. Comm. Rep. No. 6, in 1990 House Journal, at 756, 1990 Senate Journal, at 759 (emphasis added). Thus, the legislature intended that "State marine waters" encompassed both the United States territorial sea, as described in Presidential Proclamation 5928, and the "archipelagic waters" of the state.

Presidential Proclamation 5928 provides that "[t]he territorial sea of the United States henceforth extends to <u>12 nautical miles</u> from the baselines of the United States determined in accordance with international law." Proclamation No. 5928, 54 Fed. Reg. 777 (Dec. 27, 1988) (emphasis added). Thus, we conclude that the territorial sea contemplated in HRS §§ 189-1.5 and 189-2.5 extend twelve nautical miles from Hawai'i's baseline.

---

[16]     President Ronald Reagan issued Presidential Proclamation 5928, entitled "Territorial Sea of the United States of America," on December 27, 1988. Proclamation No. 5928, 54 Fed. Reg. 777 (Dec. 27, 1988). In Proclamation 5928, President Reagan extended the United States' territorial sea to "12 nautical miles from the baselines of the United States," reasoning that "[e]xten[ding] the territorial sea . . . to the limits permitted by international law will advance the national security and other significant interests of the United States." <u>Id.</u> Proclamation 5928 explicitly states, "Nothing in this Proclamation . . . extends or otherwise alters existing Federal or State law or any jurisdiction, rights, legal interests, or obligations derived therefrom[.]" <u>Id.</u>

The legislature also employed the term "archipelagic waters" in the conference committee report for HRS § 189-1.5 but did not provide a definition.  See Conf. Comm. Rep. No. 6, in 1990 House Journal, at 756, 1990 Senate Journal, at 759.  The 1982 United Nations Convention on the Law of the Sea (UNCLOS) defined the extent of "archipelagic waters" as "the waters enclosed by the archipelagic baselines drawn in accordance with article 47 . . . regardless of their depth or distance from the coast."  UNCLOS art. 49, ¶ 1, Dec. 10, 1982, 1833 U.N.T.S. 397. Under UNCLOS art. 47, ¶ 1, archipelagic baselines are determined by drawing straight lines "joining the outermost points of the outermost islands and drying reefs of the archipelago" to create an area enclosing the main islands.  Id. at art. 47, ¶ 1. Although the United States has not ratified UNCLOS, the UNCLOS definition of "archipelagic waters" is widely accepted in international law.  See, e.g., Restatement (Third) of Foreign Relations Law § 11 cmt. (referencing the UNCLOS definition).  As the BLNR found, the archipelagic waters of Hawai'i do not extend "more than fifty miles to the north or east of the islands, or more than one hundred miles to the west or south."  Importantly, it is undisputed that longline fishing vessels do not fish within the archipelagic waters.

In summary, neither the territorial sea nor the "State marine waters" encompass the 200-mile area of the federal EEZ. By prohibiting longline fishing in Hawai'i's territorial sea in HRS § 189-2.5, the legislature intended to prohibit longline fishing within a 12-mile area. Further, the "State marine waters," which the legislature intended to include the territorial sea and the archipelagic waters, do not encompass the 200-mile area of the federal EEZ. Therefore, under HRS §§ 189-2.5 and 189-1.5, the state's current statutory authority to regulate longline fishing does not extend to the outer limits of the federal EEZ.

2. **The longline fishing vessels at issue in this case do not fish within the "waters of the State," the state marine waters, or the channels between the islands**

The BLNR's findings of fact note that "longline boats do not fish closer than fifty miles to the north and east of the main Hawaiian Islands, and [not closer than] one hundred miles to the south and west of the main Hawaiian Islands." On appeal to this court, an agency's finding of fact will be reversed only where the finding of fact is "[c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record." HRS § 91-14(g); see Flores, 143 Hawai'i at 121, 424 P.3d at 476. Chun does not contest this finding of fact, nor

does he point to any contrary evidence.[17]  Thus, the BLNR's finding of fact was not clearly erroneous.

As to the state's marine waters, the BLNR explicitly found that "[t]he longline boats do not fish in this twelve-mile belt."  Another BLNR conclusion of law specifically addressed waters between the islands, finding that "[t]he longline boats do not fish in the channels."  On appeal, Chun does not challenge these conclusions of law.  We thus accept the BLNR's conclusions that the longline fishing vessels at issue in this case do not fish within the 12-mile area of the state marine waters, including the channels between the islands.

Under the current statutory framework, the legislature delegated to the DLNR the authority to issue CMLs to persons that take marine life within or outside the State for commercial purposes.  Notwithstanding the undisputed fact that longline fishing vessels at issue do not fish within the "waters of the State" under HRS § 189-5, the statute nonetheless allows CMLs to be issued to a foreign nonimmigrant crewmember on a longline fishing vessel for marine life caught outside state waters.

---

[17]    Chun argues in his Opening Brief that the BLNR's conclusions of law were premised on "clear factual errors."  Specifically, Chun argues that the "BLNR incorrectly concluded the 'waters of the State' . . . do not include waters of the EEZ," citing to the BLNR's conclusions of law within the BLNR's broader conclusion that "[t]he [l]ongline [b]oats do not [f]ish 'in the [w]aters of the State.'"  In its Answering Brief, the BLNR pointed out that Chun's Opening Brief did not dispute the findings of fact that established where longline fishing vessels actually fish.

***NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER***

## V.    CONCLUSION

For the foregoing reasons, the circuit court's final judgment filed on July 1, 2019, is affirmed.

DATED:  Honolulu, Hawai'i, August 11, 2022.

Lance D. Collins                          /s/ Mark E. Recktenwald
Bianca Isaki
for Plaintiff-Appellant                   /s/ Paula A. Nakayama
Mālama Chun
                                          /s/ Sabrina S. McKenna
William J. Wynhoff
Daniel A. Morris                          /s/ Michael D. Wilson
for Defendant-Appellee
Board of Land and Natural                 /s/ John M. Tonaki
  Resources, Department of Land
  and Natural Resources,
  State of Hawai'i

Geoffrey M. Davis
for Defendant-Appellee
Hawai'i Longline Association

